UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re:

DAVID LEWI-EMMANUEL STOCKMAN, Case No. 26-20982-dob

Debtor. Chapter 11

---

DAVID LEWI-EMMANUEL STOCKMAN,

Plaintiff,

v Adv. Proc. No. 26-02023-dob

ZIAD DAOUD, Ph.D,

Defendant.

---

**DEFENDANT ZIAD DAOUD'S**
**ANSWER AND AFFIRMATIVE DEFENSES**

---

Defendant Ziad Daoud ("Defendant" or "Dr. Daoud"), by his undersigned attorneys, states as follows for his Answer and Affirmative Defenses to Plaintiff's Complaint:

**ANSWER**

**GENERAL ALLEGATIONS**

1. This action seeks recovery of $244,782.21 as Plaintiff's proportional interest in the appreciation and sale proceeds of Daoud's original Michigan residence at 3114 Valley Drive. Plaintiff contributed $97,688.10 toward Daoud's relocation, acquisition, preservation, taxes, and improvement of that property: $54,688.10 in immigration-related expenditures enabling Daoud and his family to relocate and establish household; $13,000.00 for renovations; and $30,000.00 used to pay delinquent or outstanding property taxes and preserve the property.

**<u>ANSWER</u>: Dr. Daoud admits the allegations in this paragraph insofar as Plaintiff seeks recovery. Dr. Daoud denies as untrue that Plaintiff contributed anything towards Dr. Daoud's relocation, acquisitions, preservation, taxes or improvement of his residence.**

2. The advances paid immigration counsel, government filing charges, premium-processing charges, administrative charges, and related cost for consultation, an H-1B petition, premium processing, DS-260 immigration-visa matters, a J-1 waiver for Rola, and one-step I-140 and I-485 permanent-residence matters for the family.

**<u>ANSWER</u>: Dr. Daoud denies as untrue the allegations in this paragraph. By way of further response, all immigration-related costs were paid by Covenant Pathology Associates, P.C., later known as Michigan Health Clinics, P.C. ("MHC") as an employment benefit and not as an advance.**

3. The final one-step professional fee was $5,000 per family member. For six family members, that professional fee was $30,000. Adding the $6,625 filing charges and $300 administrative charge for the phase produced a one-step total of $36,925 and an aggregate advance of $54,688.10.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

4. Plaintiff also personally loaned or advanced $13,000.00 for renovations to Daoud's residence. A contemporaneous January 25, 2021 contractor email itemized $10,900.00 in trim materials, trim finishings, and stairway work "up to date," stated that base-and-case installations costs were still unknown, and asked Plaintiff and Daoud how the work should be invoiced.

**<u>ANSWER</u>: Dr. Daoud denies as untrue the allegation that Plaintiff personally loaned or advanced $13,000 to Dr. Daoud. Dr. Daoud admits the remaining allegations in this paragraph.**

5. None of the immigration, renovation, or property-tax contributions was intended as a gift, wage, bonus, or gratuitous employment benefit. Plaintiff made the contributions as an investment in Daoud's acquisition, preservation, and improvement of the Valley Drive property, with the understanding, express or implied from the parties' words, conduct, relationship, purpose of the payments, and Daouds acceptance of the benefits, that Plaintiff would be repaid from or participate proportionally in the property's equity, appreciation, or sale proceeds.

**ANSWER: Dr. Daoud denies as untrue the allegations in this paragraph.**

6. Daoud accepted and retained the full benefit of all three categories of property-related investment contributions but has not paid Plaintiff any portion of the sale-proceeds, appreciated value, or return on the $97,668.10 invested. The advances arose in the context of Daoud's employment by Covenant Pathology Associates, P.C., later known as Michigan Health Clinics, P.C. (collectively, "MHC"). That employment relationships, MHC's CMU contract, Daoud's abrupt immediate resignation on October 2, 2023, and his immediate transition to MyMichigan Health and direct CMU work explain why the advances were not gifts and why repayment became due no later than his departure.

**ANSWER: Dr. Daoud denies as untrue the allegations in this paragraph.**

7. MHC possesses separate corporate claims arising from the same employment relationship, including claims concerning Daoud's immediate resignation, the ninety-day notice obligation, the noncompetition and noninterference covenants, the diversion of the CMU relationship, CMU's receipt and nonpayment of the July-through-September 2023 invoice, and the MyMichigan Health alleged recruitment and employment of Daoud with knowledge of those restrictions. Those corporate claims are not included in Plaintiff's $97,668.10 personal recovery and are pleaded only as related background and as a joinder-ready factual record.

**ANSWER: Dr. Daoud denies as untrue the allegations in this paragraph.**

8. The action remains focused on Plaintiff's own bankruptcy estate and the $244,782.21 property-investment claim owed directly to Plaintiff. Plaintiff does not purport to represent MHC or to recover MHC's sperate damages. The related corporate facts are pleaded because they bear on Daoud's credibility, the parties' course of dealing, when repayment became due, and the circumstance of Daoud's repudiation, and because they permit MHC, through licensed counsel, to seek joinder or amendment without rebuilding the factual record from the beginning.

**ANSWER: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegation contained in this paragraph.**

9. Plaintiff is an individual residing in Saginaw County, Michigan. He is the debtor and debtor in possession in In re David Lewi-Emmanuel Stockman, Case No. 26-20982-dob, a Chapter 11 case proceeding under Subchapter V in this Court.

**ANSWER: Dr. Daoud admits the allegations in this paragraph.**

10. Under 11 U.S.C. § 1107 (a) and Federal Rule of Bankruptcy Procedure 6009, Plaintiff may prosecute claims that are property of his bankruptcy estate.

**ANSWER: Dr. Daoud admits the allegations in this paragraph.**

11. Daoud is an induvial who, upon information and belief, resides in Midland County, Micihgan and works in Michigan. He may be served under Federal Rule of Bankruptcy Procedure 7004.

**ANSWER: Dr. Daoud admits the allegations in this paragraph.**

12. MHC is a Michigan professional corporation and is legally distinct from Plaintiff. Plaintiff was an officer and authorized representative of MHC but cannot appear pro se on MHC's behalf.

**<u>ANSWER</u>: Dr. Daoud admits the allegations in this paragraph.**

13. MyMichigan Health is a Michigan health system operating in Midland and other locations. The precise legal identity of the entity that recruited and employed Daoud should be confirmed through discovery before any corporate claim is formally added.

**<u>ANSWER</u>: Dr. Daoud admits the allegations in the first sentence of this paragraph. Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

14. CMU is a Michigan constitutional university and body corporate. George E. Kikano, M.D. ("Kikano"), served as CMU's Vice President for Health Affairs and Dean of the College of Medicine during the relevant period, previously recruited Plaintiff to CMU, introduced Plaintiff to Daoud in 2020, and signed the CMU-MHU Professional Services Agreement.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

15. The United States District Court for the Eastern district of Michigan has jurisdiction under 28 U.S.C. § 1334(b) because Plaintiff's personal reimbursement claims are related to his pending bankruptcy case.

**<u>ANSWER</u>: Dr. Daoud admits the allegations in this paragraph insofar as jurisdiction is proper in this Court. Defendant denies that Plaintiff has any claim against Defendant.**

16. This proceeding is referred to this Court under E.D., Mich.LR 85.50(a).

**<u>ANSWER</u>: Dr. Daoud admits the allegations in this paragraph.**

17. This is an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(a) because Plaintiff seeks to recover money belonging to the bankruptcy estate.

**<u>ANSWER</u>: Dr. Daoud admits this is an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(a) but denies Dr. Daoud possesses or ever received money belonging to the estate.**

18. The personal claim arose before the petition date and became property of the estate under 11 U.S.C. § 541(a)(1). Recovery will increase assets available to fund Plaintiffs Subchapter V reorganization and creditor distribution.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph.**

19. The state-law cause of action are non-core but related proceedings under 28 U.S.C. § 157(c). Plaintiff consents to the Bankruptcy Court entering final orders and judgment. If Daoud does not consent, Plaintiff request proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1).

**<u>ANSWER</u>: Dr. Daoud admits that this proceeding is non-core. Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

20. Venue is proper under 28 U.S.C. § 1409(a) because Plaintiff's bankruptcy case is pending in this District.

**<u>ANSWER</u>: Dr. Daoud admits the allegations in this paragraph.**

21. The Court may exercise personal jurisdiction under Federal Rule of Bankruptcy Procedure 7004(f) because Daoud resides, works, and engaged in the relevant conduct in Michigan.

**<u>ANSWER</u>: Dr. Daoud denies he engaged in the conduct warranting relief under Plaintiff's Complaint. Defendant admits the remaining allegations contained in this paragraph.**

22. No direct claim is presently asserted by Plaintiff against CMU. Any direct MHC claim against CMU must be evaluated by MHC's counsel for sovereign-immunity Court of Claims, notice, limitations, prior-action, and claim-splitting issues before joinder or separate filing.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

23. Before the Daoud employment arrangement, Plaintiff served as a faculty member and employee of the Central Micihgan University College of Medicine for approximately two years.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

24. Kikano personally recruited plaintiff to CMU and structured or approved Plaintiff's faculty arrangement so that plaintiff could continue maintaining his independent medical and pathology practice while simultaneously teaching and performing services for CMU.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

25. During those approximately two years, Plaintiff received the highest faculty evaluations and recognition at the College of Medicine and was regarded by Plaintiff and others as the College's top-performing professor. Plaintiff will produce the supporting evaluations, awards, or testimony available to him.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

26. Through that prior relationship, Kikano knew Plaintiff personally, knew Plaintiff's medical and pathology practice, knew Plaintiff was capable of employing and professionally supporting a clinical microbiologist, and knew the distinction between Plaintiff individually and Plaintiff's corporate medical practices.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

27. In or about 20020, Kikano contacted Plaintiff, introduced him to Daoud, and asked whether Plaintiff and Daoud could partner so that Daoud could come to the United States, obtain professional employment, and perform clinical, academic, microbiology, research, and public-health work.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

28. Kikano described Daoub as a close family friend and represented that he has a longstanding personal relationship with Daoud's family. Plaintiff understood that Kikano had been a friend of Daoud's brother in Lebanon and that Daoud's brother held the rank of general in the Lebanese military.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

29. Plaintiff relied on Kikano's introduction, existing professional relationship, and request when Plaintiff agreed to employ Daoud through Covenant Pathology Associates,

P.C./MHC, support the immigration process, and personally advance substantial immigration expenses for Daoud, his wife, and their four children.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

30. Kikano therefore had direct, preexisting knowledge of the origin and purpose of Daoud's United States employment, MHC's role as employer and immigration sponsor, Plaintiff's personal and financial assistance to the family, and the later CMU arrangement under which MHC supplied Daoud's services to CMU.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

31. These facts are relevant to knowledge, intent, inducement, justification, concealment, and causation if MHC, through counsel, later asserts that Kikano, CMU personnel, MyMichigan, or others knowingly facilitated Daoud's departure, competing employment, or diversion of the CMU relationship.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

32. On February 20, 2020, MHC, then operating as Covenant Pathology Associates, P.C., and Daoud executed a written Employment Agreement. Plaintiff signed the agreement only in his capacity as the employer's representative. A true copy is attached as Exhibit A.

**<u>ANSWER</u>: Dr. Daoud admits the allegations in this paragraph. By way of further response, the referenced Employment Agreement was subsequently rescinded by mutual agreement and superseded by an Employment Agreement dated April 10, 2020.**

33. The Employment Agreement provided for Daoud to perform full-time clinical, research, academic laboratory, medicine, microbiology, public-health-administration, and consulting services beginning October 1, 2020.

**ANSWER: Dr. Daoud admits the allegations in this paragraph insofar as they are evidenced by Exhibit A attached to the Complaint.**

34. The Employment Agreement stated a $100,000 annual salary and identified vacation, continuing-education reimbursement, hospital dues, malpractice insurance, health insurance, and potential future equity discussion. It did not state that Plaintiff personally would gift or permanently absorb immigration costs for Daoud, his wife, or his children.

**ANSWER: Dr. Daoud admits the allegations in this paragraph insofar as they are evidenced by Exhibit A attached to the Complaint.**

35. Paragraph 5 required either party to provide ninety days' written notice of termination and required Daoud to continue performing services during the notice period requested.

**ANSWER: Dr. Daoud admits the allegations in this paragraph insofar as they are evidenced by Exhibit A attached to the Complaint.**

36. Paragraph 14 imposed a three-year restrictive period and sixty-mile restricted area. It prohibited Daoud from working for a competitor in competing clinical, laboratory, or public-health services and from interfering with MHC's relationships with employees, contractors, suppliers, or customers with whom he had non-incidental contact through MHC.

**ANSWER: Dr. Daoud admits the allegations in this paragraph insofar as they are evidenced by Exhibit A attached to the Complaint.**

37. Paragraph 14 also recognized MHC's right to actual damages, injunctive relief, and other legal and equitable remedies for actual or threatened breach.

**ANSWER: Dr. Daoud admits the allegations in this paragraph insofar as they are evidenced by Exhibit A attached to the Complaint.**

38. Beginning in April 2020 and continuing through at least Aril 2021, Daoud requested, authorized, or knowingly accepted Plaintiff's payment of immigration expenses for Daoud and his family.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue.**

39. Plaintiff personally paid or caused to be paid the professional fees, filing fees, administrative charges, premium-processing charges, and convenience charges reflected in the immigration fee-and-payment summary attached as Exhibit B.

**ANSWER: Dr. Daoud denies the allegation that Plaintiff personally paid any immigration-related costs on Plaintiff's Exhibit B. Defendant admits that MHC paid certain immigration-related costs.**

40. The beneficiaries were Daoud, his wife Rola, and their four children. The purpose was to obtain or advance immigration status, visas, waivers, and permanent-residence processing for the entire six-person family.

**ANSWER: Dr. Daoud denies the allegation that Plaintiff personally paid any immigration-related costs on behalf of Defendant or his family. Dr. Daoud admits that MHC paid certain immigration costs on behalf of Dr. Daoud and his family.**

41. The contemporaneous summary initially reflected partial one-step professional-fee payments. The final agreement for the one-step phase was $5,000 for each of six family members, or $30,000 in professional fees, rather than $7,500 total.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

42. The total immigration amount paid or advanced by Plaintiff was $54,668.10. The aggregate personal advances, including the separate $13,000.00 house-renovation loan, are summarized as follows:

| **Matter** | **Calculation/basis** | **Amount** |
|---|---|---|
| H-1B / Form I-129 | Professional fees, filing fees, administrative charge, and convenience charges shown paid | $7,696.70 |
| Premium processing for I-129 | Professional fee, filing fee, and convenience charge shown paid | $1,980.00 |
| DS- immigration-visa matters | Professional fees for Daoud and family shown paid | $5,000.00 |
| J-1 waiver for Rola | Professional fees, filing fees, administrative charge, and convenience charges shown paid | $2,866.40 |
| One-step I-140 / I-485 matters | Final professional fee of $5,000 for each of six family members ($30,000), plus $6,625 filing charges and $3000 administrative charge | $36,925.00 |
| House-renovation Loan/advances | Trim materials, finishing, Stairway work, installation, and related Residential renovation costs | $13,000.00 |
| Additional personal loans | Personal loans advanced Directly to Daoud for his personal use and benefit | $30,000.00 |
| AGGREGATE TOTAL | Total personally loaned, paid, or advanced | $97,668.10 |

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

43. The calculation in Exhibit C reconciles the $54,668.10 immigration related contribution, the $13,000.00 renovation contribution, and the $30,000.00 property-tax contribution, totaling $97,668.10 invested in Daoud's relocation, acquisition, preservation, and

improvement of the Valley Drive residence. The same exhibit calculates Plaintiff's 24.4782% proportional interest and resulting $244,782.21 claim using the reported $1,000,000.00 sale price.

**<u>ANSWER</u>: Dr. Daoud denies that Plaintiff is entitled to a proportional interest in sale proceeds. Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

44. Plaintiff made these payments from personal resources or personal advances and did not intend them as a gift.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

45. Daoud knew of, requested, accepted, and retained the benefit of the immigration work for himself, Rola, and the four children.

**<u>ANSWER</u>: Dr. Daoud admits that MHC procured immigration work on behalf of Defendant and his family as part of an employer benefit.**

46. Daoud knew or reasonably should have known that a personal payment exceeding $54,000 for his family was expected to be repaid and was not included among the written compensation and benefits MHC promised in the Employment Agreement.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

47. Plaintiff alleges that the repayment obligation was a personal loan or reimbursement obligation separate from any required employer-paid immigration charge. Plaintiff seeks the full $54,668.10. If Daoud contends that federal immigration law affects any discrete component, that issue can be allocated on the evidentiary record without converting the entire family-benefit advanced into a gift.

**<u>ANSWER</u>: Dr. Daoud admits that Plaintiff alleges as much, but denies the allegation as untrue.**

48. During 2020 and 2021, at Daoud's request and for the benefit of Daoud's personal residence, Plaintiff personally loaned or advanced funds to pay for trim materials, trim finishing, stair treads and risers, installation, and related renovation work.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue.**

49. On January 25, 2021, contractor Nathan Moeller sent an email to both Daoud and Plaintiff with the subject 'Ziad job.' The email itemized $5,600.00 for trim material, $4,100.00 for finishing all trim, and $1,200.00 for installing two stairways' treads and risers, for a subtotal of $10,9000.00 “up to date.” A true copy is attached as Exhibit F.

**ANSWER: Dr. Daoud admits the allegations in this paragraph.**

50. Moeller further stated that the cost to install the base and case was not yet known, that he was attempting to arrange the trim installation, and that Plaintiff and Daoud should advise how the work should be invoiced. The email therefore confirms that $10,900.00 was an interim subtotal rather than the final renovation cost.

**ANSWER: Dr. Daoud admits the allegations in this paragraph.**

51. Plaintiff personally paid or advanced the itemized amounts and additional installation and related renovation costs, bringing the total house-renovation advances to $13,000.00. Plaintiff presently seeks $13,000.00 for that loan and reserves the right to conform the amount to the precise contractor and payment records obtained in discovery.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue.**

52. The house-renovation contributions were not wages, compensation, an MHC business expense, or a gift. They were part of Plaintiff's investment in the Valley Drive property and were made with the expectation that Plaintiff would share proportionally in the property's equity, appreciation, or sale proceeds.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

53. Daoud knew of and accepted the materials and work at his residence, was a direct recipient of the contractor's contemporaneous email, and knew or reasonably should have known that Plaintiff expected repayment.

**<u>ANSWER</u>: Dr. Daoud admits that he received the contractor's email and that the contractor performed work at Dr. Daoud's home. Dr. Daoud denies the remaining allegation contained in this paragraph.**

54. Daoud has not repaid any portion of the $13,000.00 house-renovation advances.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue. By way of further response, Dr. Daoud has repaid in full MHC, the true lender of the house-renovation advances, via salary deductions.**

54(a). When Daoud first relocated to Micihgan, Plaintiff materially assisted him in acquiring and establishing his original Michigan residence at 3113 Valley Drive, Midland, Michigan. The residence was purchased in approximately December 2020 for $399,000.00.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

54(b). In addition to the $13,000.00 renovation contribution, Plaintiff contributed $30,000.00 to pay property taxes when Daoud was behind. Those payments preserved the Valley Drive property, prevented further delinquency or enforcement, and protected the equity that Daoud later realized upon sale.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

54(c). Plaintiff's immigration-related contributions, $30,000.00 property-tax contributions, and $13,000.00 renovation contributions enabled Daoud and his family to relocate,

acquire and retain the Valley Drive residence, preserve its equity, improve the property, and maintain household liquidity while Daoud became established in the United States.

**<u>ANSWER</u>: Dr. Daoud denies the allegations in this paragraph as untrue.**

54(d). Publicly available property-history information reflects that the Valley Drive residence was acquired for approximately $399,000.00 in December 2020 and was marketed and reported as sold in 2024 for approximately $1,000,000.00. A separate property-record screenshot reports a June 21, 2024 warranty-deed transaction at $760,000.00. Because those records reflect different transaction amounts, Plaintiff pleads the 2024 disposition and proceeds on information and belief and requests an accounting and production of the closing statement, deed, settlement statement, mortgage payoff, and net-proceeds records.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

54(d)(1). After the Valley Drive sale or transfer, Daoud and his spouse acquired and moved to a separate, newer residence at 2138 N. Celena Drive, Midland, Michigan. The Celena Drive property is not the property improved by Plaintiff. It is relevant as a later-acquired asset into which the Valley drive proceeds may have been transferred. Plaintiff seeks tracing discovery, but requests an equitable lien or constructive trust against that later property only to the extent identifiable Valley Drive Proceeds can be traced into it.

**ANSWER: Dr. Daoud admits that he and his family moved to 2138 N. Celena Drive., Midland, Michigan after selling their prior residence, and that the home was not improved by Plaintiff. Dr. Daoud denies that his home is relevant to this litigation.**

54(e). Despite realizing substantial proceeds and appreciation from the 2024 disposition of the Valley Drive residence, Daoud did not pay Plaintiff any portion of the $244,782.21 proportional property-investment amount, return any portion of the $97,668.10 invested, or account for the sale proceeds.

**<u>ANSWER</u>: Dr. Daoud admits not paying Plaintiff after the disposition of the Valley Drive residence. Dr. Daoud denies that Plaintiff is entitled to any such payment or the referenced proportional property-investment amount.**

54(f). Plaintiff alleges that the parties treated the contributions as an investment in Daoud's acquisition, preservation, and improvement of the Valley Drive residence and not as gifts. Plaintiff seeks an accounting, payment of his proportional interest, restitution, disgorgement, an equitable lien, and a constructive trust against traceable sale proceeds and property acquired with those proceeds, to the fullest extent permitted by law. In the alternative, if the Court does not find an investment or equity-sharing agreement, Plaintiff seeks repayment of no less than the $97,668.10 contributed, plus interest and costs.

**<u>ANSWER</u>: Dr. Daoud admits that Plaintiff alleges Plaintiff invested in Dr. Daoud's home. Dr. Daoud denies the allegation itself as untrue.**

54(g). Using the reported $399,000.00 acquisition price and the presently pleaded $97,668.10 in advances, Plaintiff's advances equal approximately 24.4782% of the acquisition price. If the Court finds an equity-sharing or investment agreement and uses the reported $1,000,000.00 sale price, the proportional value would be approximately $244,782.21, consisting of return of the $97,668.10 principal plus approximately $147,114.11 as the proportional share of the $601,000.00 gross appreciation before transaction costs, mortgage payoff, taxes, and other adjustments.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

54(h). If the legally operative transfer price was instead $760,000.00, the same 24.4782% proportional calculation would equal approximately $186,034.48, consisting of return of the $97,668.10 principal plus approximately $88,366.38 as the proportional share of the $361,000 gross appreciation before transaction costs, mortgage payoff, taxes, and other adjustments.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

54(i). Plaintiff pleads $244,782.21 as the primary measure of his proportional property-investment claim, subject to confirmation of the final sale price and a full accounting. If the Court determines that the investment agreement cannot be enforced as an equity-sharing agreement, Plaintiff alternatively seeks return of no less than the $97,668.10 invested, plus prejudgment interest, postjudgment interest, and costs.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

54(j). Cullen James, another former MHC employee, informed Plaintiff on multiple occasions that Daoud had been communicating with Randy Tashjian before Daoud left MHC.

Plaintiff pleads those reports on information and belief and seeks confirmation through James's testimony, Daoud's and Tashjian's communications, telephone records, and discovery.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

54(k). Tashjian had been adverse to Plaintiff in litigation beginning in approximately 2021. Plaintiff further alleges that Tashjian had participated with Russell Bush and others in conduct that Plaintiff contends contributed to the progressive destruction of Plaintiff's forensic-services company and to an MCA-related claim that was later dismissed. These allegations are included to explain the asserted motive and context for the reported communications and are not pleaded as independently adjudicated facts unless established by the cited proceedings and discovery.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

54(l). On information and belief, the Daoud-Tashjian communications concerned or assisted Daoud's planned departure from MHC, and Daoud and Tashjian at one point reportedly proposed or considered using the same attorney. Plaintiff seeks discovery concerning the timing, content, purpose, participants, and legal or employment assistance reflected in those communications.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

54(m). These reported communications are relevant to Daoud's intent, the timing and coordination of his abrupt departure, his decision not to honor Plaintiff's property-investment rights

after receiving the Valley Drive sale proceeds, and MHC's potential separate claims. Plaintiff does not presently assert an independent tort claim against Tashjian in this adversary complaint.

**__ANSWER__: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

55. On November 23, 2020, CMU and MHC executed a Professional Services Agreement. A true copy is attached as Exhibit D.

**__ANSWER__: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. By way of further response, Dr. Daoud is not a party to said Agreement. To the extent a response is required, Dr. Daoud admits that the Exhibit appears to the Agreement referenced by Plaintiff.**

56. The agreement expressly identified Daoud as MHC's employee and required MHC to assign him to provide ten hours per week of professional teaching, research, and service activities for CMU.

**__ANSWER__: Dr. Daoud admits the allegations contained in this paragraph insofar as they are evidenced by the exhibited agreement.**

57. The original agreement required CMU to pay MHC—not Daoud individually—in equal monthly installments. It also provided that MHC was an independent contractor and that CMU had no employer-employee relationship with MHC or Daoud.

**__ANSWER__: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

58. Kikano signed the agreement for CMU as Vice President for Health Affairs and Dean of the College of Medicine. He therefore had direct knowledge that Daoud was MHC's employee, that MHC supplied his CMU services, and that CMU's payment obligation ran to MHC.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

59. The parties renewed or extended the relationship after the original term. CMU later asserted that the final written renewal ended June 30, 2023 and that the agreement contained no automatic extension. CMU did not, however, provide MHC with timely advance notice that it intended to terminate or refuse renewal before Daoud continued performing CMU work into the next academic year. The parties' prior course of dealing, CMU's continued scheduling and acceptance of Daoud's services, and CMU's knowledge that MHC continued paying him are relevant to extension, holdover, waiver, ratification, implied agreement, and unjust enrichment.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

60. Notwithstanding CMU's asserted June 30, 2023 expiration date, Daoud continued devoting MHC-paid work time to CMU during July, August, and September 2023. He continued going to his CMU office, checking experiments, attending meetings, performing research and student follow-up, developing or working on class programming, and preparing for scheduled

academic activities while he remained an MHC employee and while MHC continued carrying his salary and employment obligations.

**<u>ANSWER</u>: Dr. Daoud admits committing minimal time to CMU during the relevant period. By way of further response, Dr. Daoud denies this information is relevant to Plaintiff's claims.**

61. MHC invoiced CMU $4,028.42 for each of July, August, and September 2023, for a total of $12,085.26. The invoice, dated August 23, 2023, is attached as Exhibit E. The invoice was transmitted on August 24, 2023 to Kikano and CMEDFinance@cmich.edu. CMU's later emails addressing the invoice and offering $600 for Daoud's August 10, 2023 orientation presentation confirm receipt and knowledge of the demand, even though CMU disputed the full amount.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

62. CMU has not paid the $12,085.26. CMU asserted that Daoud did not teach regular classes during the summer and that the written renewal had ended. That position improperly equates Daoud's CMU responsibilities with classroom teaching alone. The CMU agreement required teaching, research, and service activities. A medical school does not cease research, experiments, curriculum development, meetings, student supervision, orientation, office work, and preparation merely because regular classroom sessions are reduced or absent during part of the summer. CMU itself acknowledged Daoud's August 10, 2023 orientation presentation and offered to pay his employer for that work.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

62A. Daoud contemporaneously identified specific fall teaching dates for September 29, October 11, October 13, November 6, November 22, and December 13, 2023, and further stated that he met with students in the laboratory every other Wednesday for research work and follow-up. These were not speculative future possibilities; they were scheduled responsibilities associated with his continuing CMU role. It is therefore implausible that CMU had simply ended the relationship and expected no further services. The more reasonable inferences are that CMU intended to renew or continue the MHC arrangement, or that CMU and Daoud intended to move the same teaching, research, and service work into a direct arrangement with Daoud after his departure from MHC. Discovery is required to determine which occurred.

**ANSWER: Dr. Daoud admits that he identified CMU sessions for September 29, October 11, October 13, November 6, November 22, and December 13, 2024, and that he meets with students every other Wednesday. Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

63. Those facts support MHC's position that: (a) the relationship continued by extension, course of dealing, holdover, waiver, ratification, or implied agreement; (b) CMU knowingly accepted valuable services while MHC continued paying Daoud; (c) CMU is liable at minimum for the reasonable value of accepted services under implied-contract, quantum-meruit, or unjust-enrichment principles; (d) CMU's records, Daoud's office access, calendars, experiments,

research work, curriculum work, student supervision, orientation work, and scheduled fall assignments will establish the extent of the continued services; and (e) the continuation of scheduled fall duties makes it substantially more likely that CMU intended either to renew the MHC arrangement or to transition the same work directly to Daoud rather than actually discontinue the services.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

64. On October 2, 2023, Daoud, through counsel, gave notice that he was resigning effective immediately.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue. By way of further response, Dr. Daoud resigned from MHC effective September 27, 2023.**

65. Daoud did not provide the contractually required ninety days' written notice and did not provide the transition period required by the Employment Agreement.

**ANSWER: Dr. Daoud admits that he resigned effective immediately upon his notice. By way of further response, MHC first materially breached the Employment Agreement and therefore relieved Dr. Daoud of his obligation to provide notice.**

66. Upon information and belief, Daoud had arranged or materially advanced his next employment before the immediate resignation.

**ANSWER: Dr. Daoud admits the allegations in this paragraph. By way of further response, MHC helped facilitate Dr. Daoud's subsequent employment.**

67. Immediately after leaving MHC, Daoud assumed a laboratory or microbiology leadership role with MyMichigan Health in Midland and continued or began direct work for CMU as a professor or part-time faculty member. Daoud's October 23, 2023 LinkedIn profile identified him simultaneously as MyMichigan's full-time Microbiology Director beginning October 2023 and as a part-time CMU College of Medicine professor, corroborating the overlap in the roles.

**ANSWER: Dr. Daoud admits the allegations contained in this paragraph. By way of further response, Dr. Daoud's current position at CMU is unpaid.**

68. MyMichigan operated within the Employment Agreement's restricted area and competed in clinical laboratory, microbiology, diagnostic, and public-health services of the type Daoud performed for MHC.

**ANSWER: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph**

69. Daoud's direct CMU work was the same as or substantially similar to the teaching, research, and professional services that MHC had supplied to CMU through Daoud.

**ANSWER: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph. By way of further response, Plaintiff's question fails to identify relevant timeframes for comparison.**

70. Kikano had direct knowledge of MHC's employment and CMU contractual relationships because he signed and administered the CMU agreement, had previously recruited Plaintiff, and had introduced Daoud to Plaintiff. Plaintiff alleges on information and belief that Kikano used those relationships and his institutional influence to help Daoud obtain the MyMichigan position and to facilitate Daoud's transition away from MHC and toward direct CMU

work. The exact communications, participants, offer terms, recommendations, and coordination require discovery.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

71. The abrupt timing-immediate resignation followed by immediate competing and direct-customer work-supports the inference that the transition was planned before October 2, 2023 and was not an unplanned post-resignation development.

**ANSWER: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

72. Plaintiff understands that Daoud's initial H-1B approval period ended on or about September 30, 2023. Daoud resigned effective immediately on October 2, 2023-essentially three years to the day after his MHC employment began and immediately after the expected end of the initial H-1B period.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue. By way of further response, Dr. Daoud resigned from MHC effective September 27, 2023, and has held a Green Card since July 2022.**

73. Plaintiff does not allege that immigration law required Daoud to remain employed by MHC. Daoud could seek lawful immigration authorization to change employers. The relevant point is that any visa expiration, extension, portability, or employer-change process did not itself cancel Daoud's separate contractual duties to provide ninety days' notice, avoid prohibited competition, and refrain from interfering with MHC's customer relationships.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

74. By its terms, the Employment Agreement prohibited Daoud during the restrictive period from accepting competing clinical, laboratory, microbiology, or public-health work within the restricted area and from interfering with MHC's relationship with CMU. The agreement did not prohibit Daoud from all work, but it restricted the particular MyMichigan and direct-CMU activities alleged here.

**<u>ANSWER</u>: Dr. Daoud admits the operative Employment Agreement purports to restrict him from being employed by an employer providing competitive clinical, laboratory, or public health services. Dr. Daoud denies the remaining allegations contained in this paragraph as untrue.**

75. Upon information and belief, before October 2, 2023, Daoud specifically sought to contract with CMU in his own name and receive the CMU compensation directly, despite CMU's established arrangement with MHC and despite the noninterference covenant. Daoud maintained an office at CMU and continued using MHC-paid time for CMU work. Text messages and emails involving Kikano allegedly reflect Daoud's continuing CMU role, office access, direct-contract request, scheduled fall teaching and research obligations, and Kikano's assistance in obtaining the MyMichigan position.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

76. Upon information and belief, Daoud assumed or attempted to assume for himself the same CMU teaching, research, curriculum, experiment, student-supervision, and service work

that CMU had previously purchased from MHC, and sought or arranged for CMU to pay him directly rather than paying MHC. MHC is entitled to discovery and, if supported, an accounting and disgorgement of compensation attributable to diverted MHC work.

**ANSWER: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

77. CMU's position that its written renewal with MHC ended June 30, 2023 is difficult to reconcile with the contemporaneous evidence that Daoud continued using a CMU office, checking experiments, attending meetings, working with students, performing curriculum or class-programming work, appearing at orientation, and holding scheduled fall teaching and research responsibilities. Those facts support MHC's contention that the services were continuing and that the relationship was being renewed, held over, or diverted to Daoud directly rather than actually terminated.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

78. Kikano's prior recruitment of Plaintiff, his 2020 introduction of Daoud, his longstanding personal relationship with the Daoud family, his execution of the CMU-MHC agreement, and his knowledge that MHC employed and sponsored Daoud support the inference that Kikano knew of MHC's contractual and business interests when the transition occurred.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

79. The precise dates and terms of Daoud's H-1B change-of-employer filing, MyMichigan offer and onboarding, any recommendation or introduction by Kikano, direct CMU appointment and compensation, CMU office access, calendars, course and curriculum assignments, experiments, research meetings, student supervision, and all communications among Daoud, Kikano, CMU, and MyMichigan are uniquely within Daoud's and the third parties' possession and should be established through document discovery, subpoenas, and depositions.

**ANSWER: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

80. MHC previously prepared and verified a complaint alleging that Daoud breached the ninety-day notice provision, the noncompetition provision, and the noninterference provision by accepting MyMichigan employment and directly performing CMU services. MHC sought damages and injunctive relief.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

81. Plaintiff's willingness to invest $97,668.10 in immigration, renovation, and property-tax expenditures was based on the parties' relationship, Daoud's requests and acceptance, the direct connection between the expenditures and the Valley Drive household and property, and the understanding that Plaintiff would be paid from or participate in the property's resulting equity and sale proceeds rather than permit Daoud to retain the entire windfall.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue.**

82. No signed promissory note fixed a calendar repayment date. Under the parties' circumstances, repayment was due within a reasonable time and, at the latest, when Daoud abruptly terminated the relationship on October 2, 2023 and immediately pursued competing employment and direct work with MHC's customer.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue. By way of further response, Dr. Daoud denies Plaintiff ever personally loaned Defendant any money.**

83. Any continued forbearance associated with Daoud's ongoing MHC employment ended when Daoud left without the promised notice or transition.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue. By way of further response, Dr. Daoud denies Plaintiff ever personally loaned Defendant any money.**

84. Daoud has not paid Plaintiff any portion of the $244,782.21 proportional property-investment claim or returned any portion of the $97,668.10 invested.

**ANSWER: Dr. Daoud admits not having paid Plaintiff anything. By way of further response, Dr. Daoud denies Plaintiff ever personally loaned Defendant any money.**

85. All personal loan claims existed before Plaintiff filed Chapter 11 and are property of the bankruptcy estate. Their collection is material to the funding and feasibility of Plaintiff's Subchapter V reorganization.

**ANSWER: Dr. Daoud denies the allegations in this paragraph as untrue. By way of further response, Dr. Daoud denies Plaintiff ever personally loaned Defendant any money.**

86. The corporate facts above overlap with Plaintiff's personal claims because the same employment relationship, witnesses, documents, timeline, and abrupt departure bear directly on whether the personal advances were gifts, when repayment became due, and Daoud's credibility and intent. Nevertheless, the relief requested in Counts I through IV is limited to Plaintiff's own

$244,782.21 proportional property-investment claim, or alternatively return of the $97,668.10 invested, plus interest and costs.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

87. MHC's potential claims include: (a) breach of the ninety-day notice and continued-service obligations; (b) breach of the noncompetition covenant through competing MyMichigan employment; (c) breach of the noninterference covenant through Daoud's effort to contract directly with CMU; (d) CMU breach, account stated, implied contract, quantum meruit, and unjust enrichment concerning the $12,085.26 invoice and accepted post-June 2023 services; (e) an accounting and, where legally supported, disgorgement of direct CMU compensation; (f) damages arising from diversion or loss of the CMU relationship; (g) tortious interference by the proper MyMichigan employing entity if discovery establishes knowledge and intentional procurement of breach; (h) tortious interference by responsible CMU actors if discovery establishes knowing diversion; and (i) civil conspiracy only to the extent supported by an underlying actionable tort and evidence of coordinated conduct.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

88. MHC's proposed claims against Daoud include breach of the written Employment Agreement based on: (a) failure to provide ninety days' written notice and continue services during

the notice period; (b) accepting competing employment with MyMichigan within the three-year, sixty-mile restriction; (c) interfering with MHC's CMU relationship; (d) attempting to contract directly with CMU and obtain compensation that had been paid to MHC; and (e) causing transition, replacement, lost-revenue, and other provable damages.

**ANSWER: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

89. Before adding MHC, counsel should confirm the status of the October 2023 MHC v. Daoud action and determine whether amendment, substitution, removal, consolidation, abstention, or a separate proceeding is required to avoid duplicative litigation or claim splitting.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

90. Before asserting a direct federal claim against CMU, counsel should analyze CMU's status as a state constitutional entity, sovereign immunity, 11 U.S.C. § 106, Central Virginia Community College v. Katz, 546 U.S. 356 (2006), Michigan Court of Claims jurisdiction, and the notice provisions of MCL 600.6431.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91. The common factual and legal questions include Daoud's employment duties, the validity and breach of the restrictive covenants, the timing and circumstances of his resignation, his continued CMU activities, any direct CMU compensation, communications among Daoud,

Kikano, CMU, and MyMichigan, and the damages caused by the transition. Those common questions support joinder or coordinated adjudication while permitting separate damage awards to Plaintiff's estate and MHC without double recovery.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91A. The following identifies claims and relief that MHC may assert only after appearing through licensed counsel. They are not presently asserted by Plaintiff, do not enlarge Plaintiff's personal demand, and are included solely to preserve a complete common factual record for a procedurally proper motion for joinder or amended complaint.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91A-1. Upon appearance through licensed counsel, MHC may adopt the common factual allegations in this Complaint and add itself as a plaintiff without adopting, owning, or seeking recovery on Plaintiff's personal loan claims.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91B. Potential MHC claim—Breach of Employment Agreement against Daoud: MHC performed its obligations; Daoud failed to provide the required ninety days' notice, failed to continue services during that period, accepted competing work at MyMichigan within the restricted area and period, and interfered with MHC's CMU relationship. MHC may seek actual damages, lost profits proven with reasonable certainty, replacement and transition costs, prejudgment interest, costs, and any still-available equitable relief.

**ANSWER: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph. By way of further response, Dr. Daoud denies MHC has any claims against Dr. Daoud.**

91C. Potential MHC claim—Breach of Contract and Account Stated against CMU: MHC supplied Daoud's teaching, research, experimental, programming, meeting, student-mentoring, orientation, office, and other professional services after June 30, 2023. CMU received Invoice No. 2006551 for $12,085.26, responded to the billing dispute, acknowledged post-June work, and failed to pay the full invoice. The existence of already-scheduled fall teaching dates, recurring student research meetings, office responsibilities, and continuing experiment and curriculum work supports the inference that CMU intended the relationship to continue and did not actually discontinue Daoud's services after June 30.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91D. Potential alternative MHC claims—Implied Contract, Quantum Meruit, and Unjust Enrichment against CMU in the alternative: even if CMU proves the last signed extension expired

June 30, 2023, CMU knowingly accepted the benefit of Daoud's continuing work while MHC continued paying his compensation and permitting him to use MHC work time for CMU activities. The medical school's summer academic calendar did not eliminate research, experiments, programming, meetings, mentoring, office responsibilities, orientation, preparation, or already-scheduled fall teaching duties. CMU's continued scheduling of Daoud for fall activities supports the inference that CMU intended either to continue the MHC arrangement or to contract with Daoud directly for substantially the same services.

**ANSWER: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91E. Potential MHC claim—Tortious Interference against MyMichigan: upon proof that the correct MyMichigan entity knew of Daoud's restrictive covenants and notice obligation, MHC may allege that MyMichigan intentionally and improperly procured or facilitated Daoud's breach by recruiting and employing him in restricted competing work and coordinating the transition before his resignation.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91F. Potential MHC relief—Accounting and Disgorgement: MHC may seek an accounting of all compensation, stipends, contract payments, benefits, or other value paid or promised by CMU or MyMichigan to Daoud for work diverted from MHC, and disgorgement to the extent permitted by law and supported by the evidence.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91G. MHC counsel should identify the precise MyMichigan defendant, evaluate the forum and sovereign-immunity issues applicable to CMU, confirm the status of the prior 2023 MHC action, and then proceed by joinder, amendment, consolidation, removal, or a separate coordinated action as procedurally appropriate.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

91H. Because MHC is a separate corporation, only licensed counsel may sign and prosecute the proposed MHC counts. Plaintiff expressly preserves all MHC claims, seeks no corporate recovery in Counts I-IV, and requests no double recovery.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent an answer is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

## COUNT I - BREACH OF ORAL AND IMPLIED-IN-FACT REIMBURSEMENT AGREEMENT – IMMIGRATION ADVANCES

92. Plaintiff incorporates paragraphs 1 through 91 as if fully restated.

**<u>ANSWER</u>: Dr. Daoud incorporates its preceding answers as though fully restated herein.**

93. Michigan law recognizes contracts formed by spoken words and by conduct demonstrating mutual assent. Daoud requested, directed, authorized, or knowingly accepted Plaintiff's personal payment of immigration expenses for Daoud and his family.

**<u>ANSWER</u>: Dr. Daoud denies that Plaintiff personally paid the referenced immigration expenses, and Defendant denies requesting the same.**

94. Plaintiff's payment of $54,668.10 constituted consideration and full performance.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue. By way of further response, Plaintiff did not make any such payment.**

95. Daoud received the direct and intended benefit of legal services and government processing for himself, his wife, and four children.

**<u>ANSWER</u>: Dr. Daoud admits the allegations contained in this paragraph. By way of further response, this benefit was not conferred by Plaintiff.**

96. Daoud manifested assent by requesting, accepting, and retaining those benefits while knowing or having reason to know that Plaintiff expected repayment and had not promised a gift.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

97. Because no fixed repayment date was stated, repayment was due on demand or within a reasonable time under the parties' circumstances and, at the latest, when Daoud abruptly terminated the relationship on October 2, 2023. See Jackson v. Estate of Green, 484 Mich 209, 217; 771 NW2d 675 (2009).

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

98. Daoud materially breached the reimbursement agreement by failing to repay any portion of the $54,668.10.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

99. The breach caused Plaintiff and the bankruptcy estate $54,668.10 in principal damages, plus lawful interest and costs.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

## COUNT II-BREACH OF ORAL AND IMPLIED-IN-FACT LOAN AGREEMENT -HOUSE RENOVATION ADVANCES

100. Plaintiff incorporates paragraphs 1 through 91 as if fully restated.

**<u>ANSWER</u>: Dr. Daoud incorporates its preceding answers as though fully restated herein.**

101. At Daoud's request and for Daoud's residential benefit, Plaintiff personally loaned or advanced $13,000.00 for materials, finishing, stairway work, installation, and related renovations.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

102. The January 25, 2021 contractor email to both parties contemporaneously corroborates the project, identifies $10,900.00 in costs 'up to date,' confirms that installation charges remained outstanding, and asks how the work should be invoiced.

**<u>ANSWER</u>: Dr. Daoud admits the allegations contained in this paragraph. By way of further response, the referenced email does not identify the payor.**

103. Plaintiff's payment or advancement of the renovation costs constituted consideration and full performance.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

104. Daoud manifested assent by requesting or accepting the renovation work, receiving the direct benefit at his residence, participating in communications with the contractor, and retaining the improvements while knowing that Plaintiff expected repayment.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

105. Because no fixed repayment date was stated, repayment was due on demand or within a reasonable time and, at the latest, when Daoud abruptly terminated the relationship on October 2, 2023. See Jackson, 484 Mich at 217.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

106. Daoud materially breached the house-renovation loan agreement by failing to repay any portion of the $13,000.00.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

107. The breach caused Plaintiff and the bankruptcy estate $13,000.00 in principal damages, plus lawful interest and costs.

**<u>ANSWER</u>: Dr. Daoud denies the allegations contained in this paragraph as untrue.**

107(a). The renovation advances enhanced or preserved Daoud's residential property and contributed to the value Daoud realized when the Valley Drive residence was sold or otherwise transferred in 2024.

**<u>ANSWER</u>: Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

107(b). Plaintiff primarily seeks repayment of the $13,000.00 renovation loan. In the alternative, if the evidence establishes an agreement that Plaintiff would participate in the property's appreciation or sale proceeds, Plaintiff seeks an accounting and the proportional or equitable relief supported by the evidence.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent a response is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

107(c). To prevent unjust enrichment and dissipation of traceable proceeds, Plaintiff requests an equitable lien or constructive trust only to the extent the Court finds the required facts and can trace Plaintiff's funds or their proceeds into property or assets retained by Daoud.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent a response is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

## COUNT III – BREACH OF ORAL AND IMPLIED-IN-FACT PROPERTY-INVESTMENT AGREEMENT – PROPERTY-TAX CONTRIBUTIONS

108. Plaintiff incorporates paragraphs 1 through 107 as if fully restated.

**ANSWER: Dr. Daoud incorporates its preceding answers as though fully restated herein.**

109. In addition to the immigration-related and renovation contributions, Plaintiff contributed $30,000.00 to pay property taxes on the Valley Drive residence when Daoud was behind, thereby preserving the property and its equity.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

110. The additional advances were loans, not gifts, wages, bonuses, or business expenses, and were made with the express or implied understanding that Daoud would repay Plaintiff.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

111. Daoud requested, accepted, received, and retained the benefit of the $30,000.00 property-tax investment while knowing that Plaintiff expected to be repaid from or share proportionally in the property's equity, appreciation, or sale proceeds.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

112. To the extent no fixed repayment date was stated, repayment was due upon demand or within a reasonable time and, at the latest, when Daoud abruptly terminated the parties' relationship on October 2, 2023.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

113. Daoud sold or transferred the Valley Drive property but failed and refused to pay Plaintiff any proportional share attributable to the $30,000.00 property-tax investment or to account for the sale proceeds.

**ANSWER: Dr. Daoud admits the allegations in this paragraph. By way of further response, Defendant denies Plaintiff is entitled to any such share or accounting.**

114. Daoud materially breached the oral and implied-in-fact loan agreement.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

115. The breach contributed to Plaintiff's aggregate $244,782.21 property-investment damages. Alternatively, Plaintiff is entitled to return of the $30,000.00 property-tax contribution, plus lawful prejudgment interest, postjudgment interest, and costs.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

**COUNT IV – UNJUST ENRICHMENT AND RESTITUTION (ALTERNATIVE)**

116. Plaintiff incorporates paragraphs 1 through 115 as if fully restated.

**ANSWER: Dr. Daoud incorporates its preceding answers as though fully restated herein.**

117. This Count is pleaded in the alternative under Federal Rule of Civil Procedure 8(d), made applicable by Federal Rule of Bankruptcy Procedure 7008.

**ANSWER: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent a response is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

118. Plaintiff conferred direct, measurable property-related investment benefits totaling $97,668.10 on Daoud: $54,668.10 in immigration-related expenditures enabling the family's relocation and establishment of the Valley Drive household; $13,000.00 in materials and work improving the residence; and $30,000.00 used to pay property taxes and preserve the property.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

119. Daoud knew of, requested or accepted, and retained all three categories of benefits.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

120. It would be inequitable for Daoud to retain the immigration benefits, the residential improvements, the additional personal-loan proceeds, and the value of Plaintiff's payments without reimbursement, particularly where Plaintiff undertook the advances in reliance on the parties' relationship and Kikano's personal introduction and request, and Daoud later abruptly left MHC and immediately accepted competing work.

**ANSWER: Dr. Daoud denies the allegations in the paragraph as untrue.**

121. If the Court finds no enforceable express or implied-in-fact property-investment agreement, the Court should imply an obligation in law and award restitution of no less than $97,668.10, together with any additional equitable relief supported by tracing and accounting evidence.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent a response is required, Dr. Daoud denies the allegations contained in this paragraph.**

122. Plaintiff seeks one recovery only and does not seek duplicative damages under Counts I, II, III, and IV.

**<u>ANSWER</u>: No response is required to the allegations contained in this paragraph because these allegations are not against Dr. Daoud. To the extent a response is required, Dr. Daoud lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

## <u>AFFIRMATIVE DEFENSES</u>

Defendant may rely on any and all of the following affirmative defenses in this matter:

1. Plaintiff's Complaint has failed to state a claim upon which relief can be granted.

2. Plaintiff was enjoined from filing this Complaint by a June 17, 2026, Opinion and Order of the United States District Court for the Eastern District of Michigan.

3. Plaintiff is not a proper party to this lawsuit because all payments alleged by Plaintiff were made by MHC.

4. Defendant has repaid all amounts due under the loans alleged by Plaintiff.

5. Plaintiff's claims are barred by Plaintiff's own actions, omissions, misconduct, or representations.

Dated: August 20, 2026

*/s/Jonathan E. Lauderbach*
Jonathan E. Lauderbach (P51313)
Joshua Eggert (P87786)
WARNER NORCROSS + JUDD LLP
715 East Main Street, Suite 110
Midland, Michigan 48640
Telephone: 989.698.3700
Email: jlauderbach@wnj.com
jeggert@wnj.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 20, 2026, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to Plaintiff.

*/s/Jonathan E. Lauderbach*
Jonathan E. Lauderbach